In re CONTINENTAL AIR
LINES, INC., Debtor.

In re TEXAS INTERNATIONAL
AIRLINES, INC., Debtor.

**Bankruptcy Nos. 83–04019–H2–5,
83–04020–H1–5 and
83–04021–H3–5.**

United States Bankruptcy Court,
S.D. Texas.

Sept. 10, 1985.

John J. Gallagher, Charles Warren, Clinton Batterton, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for plaintiff.

Bruce H. Simon, Christopher N. Souris, Babette Ceccotti, Cohen, Weiss and Simon, New York City, Helen Brattin, Schwartz, Waterman, Fickman & Van Os, Houston, Tex., for defendant.

Myron M. Sheinfeld, Lenard M. Parkins, Sheinfeld, Maley & Kay, Houston, Tex., Harvey Miller, Bruce Zirinsky, Weil, Gotshal & Manges, New York City, for Continental Air Lines, Inc. and Texas Intern. Airlines, Inc.

Claude D. Montgomery, Booth, Marcus & Pierce, New York City, for Official Union Labor and Pension Creditors' Committee.

UNCONTESTED FACTS AND CONCLUSIONS OF LAW WITH RESPECT TO ORDER GRANTING DEBTORS' MOTION FOR SUMMARY JUDGMENT ON ALPA'S CLAIM FOR LABOR PROTECTIVE PROVISIONS

T. GLOVER ROBERTS, Bankruptcy Judge.

### UNCONTESTED FACTS

1. Documentary evidence presented here shows that on August 14, 1981, the Civil Aeronautics Board ("CAB") approved the acquisition of Continental Air Lines, Inc. by Texas International Airlines, Inc. CAB Order No. 81–10–66. As a condition to its approval of the acquisition, the CAB imposed labor protective provisions ("LPPs") "to provide for compensatory ac-

quisition." Order No. 81–10–66. Section 1 of the LPPs states:

The fundamental scope and purpose of the conditions hereinafter specified are to provide for compensatory allowances to employees who may be affected by the proposed acquisition by Texas International Airlines, Inc. (TI) of Continental Air Lines, Inc. approved by the attached order, and it is the intent that such conditions are to be restricted to those changes in employment due to and resulting from such acquisition. Fluctuations, rises and falls, and changes in volume or character of employment brought about by other causes are not covered by or intended to be covered by these provisions.

The LPPs provided three basic types of compensation for changes in employment "due to and resulting from" the acquisition: (1) a displacement allowance for those employees who received lower compensation; (2) a dismissal allowance for those employees whose jobs were abolished; and (3) relocation expenses for those employees who were forced to move.

2. Evidence previously presented in this case on which findings by the Court were made, show that Texas International consummated its acquisition of Continental on October 12, 1981, at which time the above CAB authorization was in effect. During 1982 Continental and Texas International began to integrate their operations. On October 31, 1982, the two carriers implemented a corporate reorganization and an operational merger under the name "Continental." The employees, routes, flight schedules, and fleets were combined as one operation. The employees in each class were combined under the representation of single unions.[1] The Debtor has stated to the Court that in accordance with the LPPs, many employees who lost their jobs or who received reduced wages as a result of the acquisition applied for and received the prescribed LPP benefits.

3. On September 24, 1983, Continental filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code. Upon filing the bankruptcy petition, previous evidence shows that Continental temporarily suspended all domestic service and on September 27, 1983, Continental began rebuilding that service by reinstating a limited portion of its domestic service, requiring commensurately fewer employees. The active employees worked under "emergency work rules" and were generally paid lower wages and benefits than they had received before the filing of the petition. In response to Continental's implementation of the emergency work rules and Continental's motion to reject its pre-petition labor contracts, the Air Line Pilots Association, International ("ALPA") and the Union of Flight Attendants ("UFA") called strikes which began October 1, 1983.[2] The ALPA strike has continued to the present. The UFA strike was terminated on April 17, 1985 when the union instructed its members to offer unconditionally to return to work.

4. Following an extended trial, this Court entered an Order approving Continental's motion to reject its collective bargaining agreements with ALPA (Order of June 19, 1984), the IAM (Order of June 26, 1984) and the UFA (Order of December 5, 1984). Each contract rejection is retroactive to September 24, 1983.

5. ALPA has filed a claim in this Court for LPP benefits in the amount of $144,838,027 on the ground that its members were "dismissed" within the meaning of the LPPs upon the filing of the petition, and other events related to Continental's bankruptcy. ALPA contends that such "dismissal" was "due to and resulting from" the acquisition of Continental Air Lines, Inc. by Texas International in 1981.

---

1. See Order of this Court (Wheless, J.) re Denial of Motion to Dismiss and separate Order approving Debtor's Motion to Reject Collective Bargaining Agreement with ALPA of June 19, 1984.

2. The International Association of Machinists and Aerospace Workers ("IAM") had been on strike since August 13, 1983. Also see n. 1 above.

CONCLUSIONS OF LAW

1. As originally filed on April 30, 1985, Debtors' Motion requested this Court to enter summary judgment in Debtors' favor on the issue of the applicability of labor protective provisions to changes in wages and working conditions associated with the bankruptcy.

2. On June 3 and 4, 1985, ALPA and UFA filed motions pursuant to 28 U.S.C. § 157(d) seeking to withdraw the reference of this Motion from the Bankruptcy Court on grounds that Debtors' Motion "required the consideration of federal laws regulating interstate commerce," *i.e.,* the Railway Labor Act, 45 U.S.C. § 151 *et seq.,* and the Federal Aviation Act, 49 U.S.C. § 1378, and that withdrawal of the reference was therefore mandatory. The unions' motions remain pending in the District Court.

3. On June 3, 1985, ALPA and UFA, joined by the Official Union Labor and Pension Creditors' Committee, filed a Motion to Stay this Court's consideration of the present motion pending District Court disposition of the Section 157(d) Motion to Withdraw Reference. After hearing, this Court entered an Order denying the Motion, filed July 8, 1985, which found, *inter alia,* as follows:

> To interpret Section 157(d) as the unions propose would disrupt the claims procedure so carefully crafted in the Bankruptcy Code, by bifurcating the claims resolution process between the District Court and the Bankruptcy Court. As a practical matter, such a result would be intolerable. Not only would the Bankruptcy Court be abandoning a statutorily-charged responsibility, but it would be thrusting upon the District Court additional litigation in an already overcrowded arena, a scenario that is not only costly and time consuming, but also a ridiculously circuitous route in the bankruptcy case administration process.

Order filed July 8, 1985 at 4–5.

4. Subsequently, on July 16, 1985, Debtors filed a Motion to Estimate All Contingent Or Unliquidated Employee Claims For Purposes Of Confirmation Pursuant To Bankruptcy Code Section 502(c) And To Convert Pending Motions For Summary Judgment To Motions To Estimate The Value Of Claims. While Debtors' position denying all liability for such claims had not and has not changed, Debtors' proposed procedures changed, according to the Debtors, who argue that only the estimation process could produce allowance of claims for Plan purposes in a time frame sufficient to avoid delay in the closing of this case.

5. On June 25, 1985, this Court entered an Order granting Debtors' Motion for Extension of the Exclusivity Period up to September 5, 1985, upon the express condition that no further extensions would be granted and that the Debtors would, in fact, file a proposed Plan of Reorganization on that date. As of this date, such Plan is now on file and of record.

6. The Court is satisfied that it has jurisdiction to resolve on the merits the liability issues presented by the present motion, for the motion does not require direct interpretation or application of the statutory language of the Railway Labor Act or any other federal statute regulating interstate commerce. The question rests squarely in the bankruptcy claims adjudication process.

7. There are on file in this major reorganization proceeding at least three other § 157(d) motions to withdraw the reference which have been pending undecided on the crowded docket of the District Court for this district for over one year. *See, e.g.,* Motion Of Union Of Flight Attendants For Withdrawal Of The Reference Of Debtors' Motion To Reject Collective Bargaining Agreement Under The Railway Labor Act, filed September 7th, 1984; Motion Of Air Line Pilots Association For Withdrawal Of The Reference Of Debtors' Motion To Reject Collective Bargaining Agreement Under The Railway Labor Act, filed August 3, 1984; Motion By International Association Of Machinists And Aerospace Workers To Withdraw The Reference To The Bankruptcy Court Of The Debtors' Motion To Reject Collective Bargaining Agreements, filed July 20, 1984. The pendency of the

§ 157(d) motions and the novel and arcane nature of the issues arising from this recently enacted provision could create substantial potential difficulties in the administration of this bankruptcy case and to the bankruptcy system in general. In this Court's opinion, it is for this reason, that those courts which have considered this issue have held that § 157(d) must be narrowly construed to avoid disrupting the Bankruptcy Court system constructed by the Bankruptcy Reform Act of 1978.

While this Court has concluded that it has jurisdiction to enter summary judgment on liability on the present motion, the pendency in the District Court of the unions' motions to withdraw reference under § 157(d), have the potential for substantially delaying this reorganization. For this reason, the Court has determined that it will also estimate the value of the claims subject to this Motion pursuant to § 502(c) of the Bankruptcy Code. Since estimation is clearly a "core proceeding" and a function within the jurisdiction of the Bankruptcy Court, use of the estimation procedure by this Court will allow the now on file Debtor's Reorganization Plan to proceed without unnecessary or costly delay to the Debtor or creditor groups who may have reached agreement relative to debt repayment. The estimation procedure can, however, be simplified by resolution of the summary judgment issues now on file, by the Courts' review of facts previously established in the case and application of the appropriate law.

### No Pilots were Dismissed Within The Meaning of the LPPs

■ 8. The Court therefore addresses the legal issue raised here. ALPA's LPP claim is based solely on the "dismissal" provision of the LPPs. As ALPA states in its opposition to Debtors' motion:

> ALPA's claim ... is based on the "dismissal" provision of ¶ 5. It covers a group of employees who were not returned to work following Continental's suspension of services at the time of its filing under Chapter 11 on September 24,

1983. It is therefore unrelated to the diminished rates of pay of incumbent employees resulting from the contract rejection, and is limited only to those employees who lost their jobs when Continental filed petitions in bankruptcy on September 24, 1983, temporarily ceased operations, and resumed operations several days later on a much reduced scale.

ALPA memorandum, at 2.

9. Under Paragraph 5 of the LPPs, a "dismissal allowance" is permitted only if an employee "is deprived of employment as a result of said acquisition." Continental did not "deprive" the pilots of employment when it filed the petitions in bankruptcy, temporarily ceased operations and resumed operations three days later on a reduced scale. Rather, as this Court has already noted, Continental made significant efforts to continue its operations and to continue to employ its pilots, albeit on a reduced pay scale. (see n. 1 above).

10. Immediately after the filing of the bankruptcy petitions, Continental began telephoning its pilots in a concerted effort to convince them to continue flying. As this Court has previously held and in its findings described the events surrounding the filing of the bankruptcy petitions:

> Continental immediately went on a campaign to get the remaining pilots to agree to fly under the emergency work rules. Once the strike began on October 1, 1983, Continental maintained a telephone "bank" in which pilots were called and requested to fly for Continental notwithstanding the strike. Those that did return to work filled the positions then available and, once recalled, maintained their relative priority they enjoyed on the seniority list pre-petition.

*Memorandum of Authorities*, August 17, 1984, at 22. Thus, instead of depriving the pilots of their employment, Continental requested that they continue to fly for the company. In the sense of LPP definitions, Continental did not furlough or dismiss any pilots at the time of the bankruptcy, but instead sought to continue the employment of every pilot then on the payroll. While

some pilots may have voluntarily elected not to continue flying for Continental under the emergency work rules, that was certainly their choice. As this Court noted, shortly after the resumption of operations, Continental had more flights scheduled than it had pilots to fly them, and it was forced to cancel some scheduled flights because of pilot unavailability. This Court previously held:

> As the early initial chaotic days of filing passed and Continental began to rebuild its system, Continental needed additional pilots and made a strenuous effort to get striking pilots to return to service. There was some success in this area, but as Continental expanded its routes it was unable to fill out its list of needs from the ALPA pilots then on strike. By instructions from the chief operating officer, Continental delayed hiring pilots not on the seniority list ("new hires") until it felt it had to do so to service its re-expanding route system. Continental did not undertake employing new hires (pilots off their existing seniority list) without adequate warning to the Air Line Pilots Association and its membership. ALPA was told on October 5, 1983, that replacements would be hired if the strike was not over quickly, and Continental sent letters to this effect to all of its pilots.

*Memorandum of Authorities*, August 17, 1984, at 22–23.

11. In short, it was ALPA that withheld the services of its pilots from Continental and "convinced this Court, that its *primary* aim is to shut down Continental Air Lines," *id.*, at 17 (emphasis in original), while Continental "made a strenuous effort" to get its pilots back in the air. *Id.* at 22. In light of these previous determinations by this Court, it is clear that the pilots were not "deprived of employment" because of the filing of the bankruptcy petitions. Accordingly, no pilots were "dismissed" within the meaning of the LPPs as a result of the Continental bankruptcy.

### *LPPs Were Not Intended To And Do Not Apply to Bankrupty-Related Changes In Employment*

12. A reading of the LPP's clearly indicates that, by their own terms, the LPPs were not designed to ensure employees against any and all economic changes or conditions that in some way adversely affect their employment. As noted above, the LPPs do not cover "[f]luctuations, rises and falls, and changes in volume or character of employment" brought about by causes not "due to and resulting from such acquisition." *See supra* at 2.

13. In imposing LPPs, the CAB consistently held that they were intended to cover only changes in employment which are "fairly attributable to the merger." *Allegheny-Mohawk Merger*, 59 CAB 19, 36 (1972). The only changes which the CAB historically considered "fairly attributable to a merger were those which stem from the combination of work forces and consequent reduction in duplicative functions. LPPs were meant to alleviate the particular effects of a merger itself, such as abandonment of duplicative routes, consolidation of facilities, or the unique problems of putting together two work forces, in recognition of the fact that "[i]n merger cases there are inherent problems with duplicative work and the integration of seniority lists...." *Aloha Airlines Control by IASCO*, CAB Order 78–6–208, at 15. In contrast, where there is no such concern about duplicative routes and facilities or redundant work forces, LPPs have not been imposed at all. *Id.* Thus, LPPs were never intended "for the purpose of protecting employees against consequences of mere changes in management policy, company organization, or operating methods," but were designed only to cover changes in employment that flow *directly* from a merger or acquisition. *Hughes Tool Co., Acquisition of Air West*, 53 CAB 32, 44 (1969). *Accord, North Atlantic Route Transfer Case*, 12 CAB 124, 130 (1950); *Flying Tiger Corp. Reorganization*, 54 CAB 699, 703 (1970); *Airlift-Slick Employee Integration*, 48 CAB 958, 960 (1968); *Alaska International Air,*

*Inc., Acquisition of Great Northern Airlines, Inc.,* CAB Order 80–8–83.

14. The Court finds it significant that the CAB has consistently refused to impose LPPs on bankrupt carriers. The CAB declined to impose LPPs when approving a Braniff-PSA agreement which would have permitted the post-bankruptcy Braniff to restructure in a joint venture with PSA. In the face of the objection of Braniff unions to CAB approval without LPPs, the CAB concluded that LPPs might undermine the economic stability of the carriers and further undermine Braniff's reorganization effort because the Braniff and PSA joint venture might not go forward if LPPs were imposed. *Braniff-Pacific Southwest Agreement Exemption,* CAB Order 83–2–72. Likewise, the CAB refused to impose LPPs after the bankrupt Universal lost its route authority and another air carrier obtained Universal's authority and aircraft. *Universal-Saturn,* 60 CAB 951, 953 (1972). Although the Union and Non-Union Labor Committees argue that imposition of LPPs is different from enforcement of LPPs, no case has been cited in which LPPs have been enforced with respect to bankruptcy-related changes in employment. In the only context in which the CAB has considered the application of LPPs to changes in employment due to the possible failure of a carrier, i.e. when it has considered the imposition of LPPs, the CAB has held that LPPs do not apply.

15. The fact that LPPs do not apply to bankruptcy-related changes in employment does not necessarily leave ALPA without a forum for its claim. In Section 43 of the Airline Deregulation Act, 49 U.S.C. § 1552, Congress established a comprehensive employee protection program for the benefit of employees whose jobs are terminated as a direct result of airline deregulation. The Act specifically provides for employee protective provisions in the event of an airline bankruptcy caused by deregulation. *See Braniff Master Executive Council v. CAB,* 693 F.2d 220, 228 (D.C.Cir.1982). It appears that if ALPA has any claim for employment disruptions related to Continental's bankruptcy, it should be brought under that provision. ALPA itself appears to have recognized as much by filing a claim for employee protective provisions in which it stated that the "total loss of employment or severe wage reductions suffered by the Continental pilots resulted directly from increased competition caused by airline deregulation." Application of ALPA for Determination of Qualifying Dislocation, filed October 13, 1983. Accordingly, as a matter of law, the LPPs do not apply to the bankruptcy-related changes in employment for which ALPA seeks compensation in this Court.

*This Court Has Already Determined That The Continental Bankruptcy Was Caused By Competitive Forces Resulting From Deregulation, Including the Effects of Continental's High Labor Costs, and Not By The Acquisition of Continental By Texas International*

16. In its order rejecting Continental's contract with ALPA, this Court held:

These losses [$521.9 million] were caused primarily by Continental's inability to compete with new entrants coming into the airline industry. The principal reason for its inability to compete was that its labor costs were significantly higher than the new entrants.

*Findings of Fact,* ¶ 6, August 17, 1984. This Court has thus already determined that the primary causes of Continental's bankruptcy were the effects of deregulation and Continental's high labor costs

17. Moreover, ALPA appears to have endorsed this finding. In its claim for employee protective provisions under Section 43 of the airline Deregulation Act of 1978, ALPA declared:

On Saturday, September 24, 1983, Continental Air Lines filed for bankruptcy pursuant to Chapter 11 of the federal bankruptcy code. 11 U.S.C. Chapter 11. The Company immediately ceased all operations, and furloughed all of its pilots. Although a "new" Continental began operations on a small scale on Tuesday,

September 27, 1983, very few of the "old" Continental pilots are working, and those who are have been forced to accept drastic reductions in wages.

The total loss of employment or severe wage reductions suffered by the Continental pilots resulted directly from increased competition caused by airline deregulation. This is precisely the situation Congress had in mind when it enacted the Employee Protection Program. Both the declaration of the bankruptcy and the subsequent "major contraction" of the Company entitle affected employees to a determination of qualifying dislocation.

Application of ALPA for Determination of Qualifying Dislocation, filed October 13, 1983. ALPA's statement provides further indication to the Court that even if any Continental pilot was "dismissed" at the time of the bankruptcy, such dismissal was due to and resulting from deregulation, not from the acquisition of Continental by Texas International.

18. Under the applicable legal standard, there is an insufficient relationship between the acquisition and the bankruptcy to trigger any LPP benefits. That legal standard, recently clarified by the CAB, has been affirmed by the Eleventh Circuit, in *Pan Am Acquisition of, Control of and Merger with National Airlines*, CAB Order 83-5-99, *affirmed sub nom. Wallace v. CAB*, 755 F.2d 861 (11th Cir.1985). In reversing an arbitrator's award of LPPs in that case, the CAB held:

> Even if the record contained some support for his citation of Pan Am's post-merger problems, he himself recognized that Pam Am's problems had several other causes as well, such as escalating fuel prices and competition from new entrants
>
> .     .     .     .     .
>
> The LPPs do not require a carrier to pay a dismissal allowance where the merger is only one of several factors creating the loss.

Order 83-5-99, at 14-15. Thus, under the applicable CAB precedent it is not enough that the acquisition is simply "a cause" of the bankruptcy; it must be "a sufficiently important cause to bring the LPPs into play." *Id.* at 13. As the Non-Union Labor Committee notes, the "merger and acquisition" must be "one of the materially causative factors bringing about the dismissal, displacement or dislocation of employees." Non-Union Labor Committee memorandum, at 11.

19. This Court has already determined, and ALPA appears to have publicly affirmed, that the principal cause of the bankruptcy was deregulation. Specifically, the bankruptcy was caused by Continental's inability to compete with other airlines because of its high bankruptcy costs. See *Findings of Fact*, ¶ 6, August 17, 1984. These are the "Material causative factors" of the bankruptcy. Because of these prior determinations, it is clear that, under the applicable legal standard, there cannot be a legally sufficient nexus between the acquisition and the bankruptcy to permit the award of any LPPs. Even if the acquisition were somehow related to the bankruptcy, it is at best "only one of several factors creating the loss," and therefore the "LPPs do not require a carrier to pay a dismissal allowance...." *Pan Am, supra*, at 15. Accordingly, ALPA is not entitled to LPPs as a result of Continental's bankruptcy.

## CONCLUSION

20. For all of the reasons set forth above, the Court finds that Debtors' motion for summary judgment disallowing ALPA's labor protective provision claim in the amount of $144,838,027 should be granted.

■ 21. This Court has previously held, and reaffirms here, that it does not believe that Continental's motion for partial summary judgment presents issues whose resolution requires the consideration of federal laws regulating activities affecting interstate commerce within the meaning of 28 U.S.C. § 157(d). The Court here interprets the phrase "federal laws" to mean "federal statutes". Although Continental's objections to ALPA's claim at issue herein can in

some respects be said to arise out of federal labor law, the resolution of Continental's motion has not required the interpretation of any federal statute or the balancing of competing federal policies. Recognizing, however, that the unions have filed motions to withdraw the reference of Continental's motion from the Bankruptcy Court, this Court in the interest of efficiency and economy to the Court, as well as the parties hereby rules in the alternative, that the value of ALPA's claim for labor protective provision payments of $144,838,027 is estimated pursuant to 11 U.S.C. § 502(c) to be zero.

These Findings and Conclusions are hereby incorporated into and made a part hereof by reference to the attached order granting the Debtor's Motion for Summary Judgment. It is Ordered and Adjudged this 10th day of September, 1985.